J-S42002-19
J-S42003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO A.Q.M. AND A.A.M., MINOR CHIDREN | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.M., MOTHER | : | No. 194 EDA 2019 |

Appeal from the Decree December 14, 2018
In the Court of Common Pleas of Lehigh County
Orphans' Court at No(s):  A2018-0034,
A2018-0035

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO A.A.M. AND A.Q.M., MINOR CHILDREN | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.P.M. SR., FATHER | : | No. 196 EDA 2019 |

Appeal from the Decree December 14, 2018
In the Court of Common Pleas of Lehigh County
Orphans' Court at No(s):  A2018-0034,
A2018-0035

BEFORE:   OTT, J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY OTT, J.:                        **FILED OCTOBER 24, 2019**

M.M. ("Mother") and S.P.M., Sr. ("Father"), (collectively, "the Parents")

appeal from the decrees entered December 14, 2018, which involuntarily

_____

* Retired Senior Judge assigned to the Superior Court.

terminated their parental rights to their minor daughters, A.A.M., born in April

2004, and A.Q.M., born in February 2008 (collectively, "the Sisters").[1]  After

careful review, we affirm.

The orphans' court summarized the facts and procedural history of this

matter as follows.

> . . . . [Lehigh County Children and Youth Services ("CYS")] received its fifteenth referral regarding this family in August of 2015 as a result of injuries sustained by then-eight-year-old M.M.,[2] who left the home without his parents' knowledge and was struck by a car while riding a scooter.  Prior referrals were for a variety of issues including truancy, inappropriate housing, medical neglect of the children by the [P]arents, questions over the mental health of the children, domestic violence between the [P]arents, the [P]arents' inappropriate discipline of the children, and inadequate parenting skills.
>
> Pursuant to a stipulated agreement, all six children, including the [S]isters who are the subjects of this termination proceeding, were adjudicated dependent on August 27, 2015, pursuant to 42 Pa. C.S. §[]6302(1) based on lack of "proper care or control, subsistence, education as required by law, or other care or control necessary for [the child's] physical, mental, or emotional health, or morals."  Some of the concerns existing at the time of the adjudication hearing in August of 2015 were the children's truancy and frequent tardiness at school, hygiene issues, and lack of appropriate well-child check-ups and follow-up care, including mental health treatment.  As a result of the adjudication of the children as dependent, numerous services were court-ordered to assist the children to remain in their parents' care.  The children were ordered to attend school regularly or provide verification of compliance with cyber-

_____

[1] Because these appeals arise from the same set of facts and involve identical issues, we have consolidated them for disposition.

[2] The Sisters are only two of the Parents' six children.  The Sisters have four brothers, S.M.1, E.M., S.M.2, and M.M.  The brothers are not involved in this appeal.

schooling; cooperate with all necessary medical appointments; maintain proper personal hygiene; and cooperate with any recommended mental health treatment. The [P]arents were to cooperate with [CYS]; permit [CYS] access to the home on a weekly basis; maintain a safe and sanitary home for the children; provide verification of legal source of income; ensure that the children attend school regularly or verify their compliance with cyber-school; cooperate with any in-home services recommended by [CYS]; and ensure that the children attend all medical appointments and maintain proper personal hygiene. At that time, the [S]isters and three siblings remained in the [P]arents' home under an Order of Protective Supervision. M.M. was placed in the home of the children's maternal grandparents out of concern for his safety and supervision. A Child Protective Services (["]CPS["]) Investigation related to M.M. was underway, but not yet completed.

Between August of 2015 and January of 2016, [the Parents] did not comply with most of the court-ordered services. Additional court-ordered services were imposed on the [P]arents. By Order dated January 28, 2016, pursuant to a Change of Disposition hearing and Stipulation, both parents were ordered to undergo mental health evaluations, to follow any and all recommendations resulting from the evaluations, to enroll the children in school immediately, and to have the children seen by their pediatrician within 30 days.

On or about January 28, 2016, [CYS] received another referral that the children's oldest brother, who was over the age of 12 at the time, was performing oral sex on himself in front of the other children. The [S]isters were taken into emergency custody on or around that date. The Court determined at a shelter care hearing on February 1, 2016 that it was not in the children's best interests to remain in the home with their parents. The five children, including the [S]isters, were placed with their maternal grandparents and were reunited with M.M., who had already been placed there in August of 2015. However, toward the end of June, 2016, the [S]isters had to be moved from the maternal grandparents' home after the grandparents reported to [CYS] that three of the children were acting out sexually with one another. Upon their removal from the maternal grandparents' home, the [S]isters were placed with their maternal aunt and uncle, where they remain to this day.

Trial Court Opinion, 2/15/19, at 3-5 (footnotes and citations to the record omitted).[3]

On May 16, 2018, CYS filed petitions to involuntarily terminate the Parents' rights to the Sisters. The orphans' court held a hearing on August 3, 2018. On December 14, 2018, the court entered decrees terminating the Parents' rights. Father filed a notice of appeal on January 11, 2019, while Mother filed a notice of appeal on January 14, 2019.[4, 5] The Parents included

_____

[3] After the juvenile court removed the Sisters from the Parents' care, CYS learned that the Sisters had been the victims of sexual abuse by their brothers while in the Parents' home. N.T., 8/3/18, at 89, 92-93, 112, 132-34, 138.

[4] Generally, a party must file his or her notice of appeal within thirty days after entry of the order. **See** Pa.R.A.P. 903(a) ("Except as otherwise prescribed by this rule, the notice of appeal . . . shall be filed within 30 days after the entry of the order from which the appeal is taken."). Thirty days after December 14, 2018, was Sunday, January 13, 2019. Thus, Mother timely filed her notice of appeal on Monday, January 14, 2019. **See** 1 Pa.C.S. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, . . . such day shall be omitted from the computation.").

[5] By filing single notices of appeal from the separate decrees terminating their parental rights, the Parents violated our Rules of Appellate Procedure. **See** Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal"). On January 30, 2019, this Court issued rules to show cause why these appeals should not be quashed. The Parents' respective counsels then filed four additional notices of appeal at Superior Court docket numbers 518 EDA 2019, 519 EDA 2019, 730 EDA 2019, and 733 EDA 2019. This Court later quashed those appeals as untimely.

concise statements of errors complained of on appeal with their notices of

appeal.

On appeal, the Parents present identical claims for our review:

A. Did the [orphans'] court err as a matter of law and/or abuse its discretion in finding that [CYS] met the requirements of 23 Pa. C.S.[] §[]2511 (a)(1), (2), (5)[,] and (8) by clear and convincing evidence?

B. Did the [orphans'] court err as a matter of law and/or abuse it's [sic] discretion in finding that [CYS] sustained their burden of proof by clear and convincing evidence that the termination of [the] Parents['] parental rights to [the Sisters] best meet[s] the needs and welfare of the [Sisters] as required by 23 Pa. C.S.[] §[]2511 (b)?

Mother's brief at 4; Father's brief at 4 (suggested answers and unnecessary

capitalization omitted).

We address these claims mindful of the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

---

In a recent case, a panel of this Court declined to quash an involuntary termination appeal based on noncompliance with Rule 341, recognizing the possibility that "decisional law may have been unclear to this point[.]" ***In the Matter of: M.P.***, 204 A.3d 976, 981 (Pa. Super. 2019). However, the panel announced that this Court would quash any noncompliant appeals filed after the date of its decision on February 22, 2019. ***Id.*** at 986. Because the Parents filed their initial notices of appeal well in advance of our Court's decision in ***M.P.***, we likewise decline to quash the instant appeals.

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the orphans' court terminated the Parents' rights to the Sisters pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision pursuant to Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 6 -

*\*\**

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*\*\**

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*\*\**

23 Pa.C.S. § 2511(a)(2), (b).

We first consider whether the orphans' court committed an abuse of its

discretion by terminating the Parents' rights pursuant to Section 2511(a)(2).

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation

omitted). "The grounds for termination due to parental incapacity that cannot

be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In the instant matter, the Parents' contentions on appeal are almost identical.[6] They assert that the orphans' court failed to consider the totality of the circumstances in this case as well as their explanation for their conduct. Mother's brief at 17; Father's brief at 14. They note that they moved to Schuylkill County, an hour away from Lehigh County, which hindered their ability to participate in necessary services. Mother's brief at 18; Father's brief at 14-15. However, they suggest that this move has been a positive development overall, because it has allowed them to "stabilize[.]" Mother's brief at 18; Father's brief at 15. Finally, the Parents blame their failure to provide parental care on the juvenile court and the fact that they did not have custody of the Sisters. Mother's brief at 19-21; Father's brief at 15-17.

In its opinion, the orphans' court summarized the evidence presented during the hearing in detail. Trial Court Opinion, 2/15/19, at 3-17. Ultimately, the court found that clear and convincing evidence supported the termination

_____

[6] Initially, Father's counsel filed a letter in this Court seeking to join Mother's appellate brief. This Court entered an order on June 6, 2019, which denied counsel's request and directed her to file her own appellate brief. It appears that Father's counsel complied with our directive by simply copying Mother's brief and making some minor wording changes.

of the Parents' rights pursuant to Section 2511(a)(2). *Id.* at 19 n.29. The court explained as follows:

> At the time of the hearing, the [S]isters had been in care for over 30 months. Both parents are still in some form of denial about the sexual abuse their daughters endured while in their parents' care. Father does not acknowledge the abuse occurred, preferring to believe his parents-in-law lied about it. Mother is in denial about the seriousness of her son S.M.1 performing sexual acts on himself in front of her daughters. In over two years, neither parent has made any progress with the most important court-ordered goal, which is to attend and successfully complete protective parenting treatment. Protective parenting treatment could have taught [the Parents] to help their daughters deal with the trauma of sexual abuse perpetrated on them by family members while in their parents' care. In the 30 months their daughters have been in care, neither parent has completed this court-ordered service. The evidence presented at the termination hearing in August of 2018 clearly and convincingly demonstrated that [the Parents] are not any closer to being resources for the [S]isters than they were at the time the [S]isters were removed from the care of their parents on January 28, 2016, over two and a half years ago.

*Id.* at 17-18 (footnote omitted).

Our review of the record supports the findings and conclusions of the orphans' court. During the termination hearing, CYS caseworker Jennifer Sell testified at length regarding the Parents' failure to comply with reunification services after CYS obtained custody of the Sisters in January 2016. Ms. Sell explained that the juvenile court ordered the Parents to obtain mental health evaluations, cooperate with in-home reunification services, maintain a safe and sanitary home, and visit with the Sisters. N.T., 8/3/18, at 71-72.

Subsequently, the juvenile court held a permanency review hearing on May 23, 2016. *Id.* at 74. Ms. Sell testified that the Parents had completed

their mental health evaluations by the time of the hearing. *Id.* However, the Parents were failing to comply with in-home reunification services. *Id.* at 75. Ms. Sell explained that JusticeWorks was providing the reunification services. *Id.* at 73. While "[Mother] met inconsistently with JusticeWorks, . . . [Father] had not met with them at all." *Id.* at 75. Following the hearing, the court directed the Parents to undergo protective parenting treatment.[7] Exhibits P1A and P1B (dependency court orders). As detailed above, while the Sisters had been residing with their grandparents, CYS removed the Sisters in June 2016, due to the sexual behaviors of the Sisters' siblings, and placed them in the care of their maternal aunt and uncle, who are their current pre-adoptive foster parents. N.T., 8/3/18, at 76, 97.

Ms. Sell testified that an additional permanency review hearing occurred on August 22, 2016. *Id.* at 75. By the time of that hearing, JusticeWorks had closed out reunification services unsuccessfully. *Id.* at 78-79. Further, Father was failing to attend visits with the Sisters on a consistent basis. *Id.* at 79. During the visits that Father did attend, he "would tend to stand off to the back and not engage with the children." *Id.* After a hearing on January 6, 2017, the Parents agreed to suspend visits with the Sisters entirely. *Id.* at 80. Ms. Sell explained that the Sisters' treatment team believed "that it would be best . . . to stop having contact with parents and siblings at that time to help process the trauma and the abuse they had been through. There were

_____

[7] The record refers to this treatment interchangeably as "protective parenting treatment" and "non-offending parenting treatment."

concerns that there were signals being given at visits that were continu[ing] to trigger the trauma." *Id.* The Parents have not visited with the Sisters since December 19, 2016. *Id.* at 96.

Ms. Sell testified that the next permanency review hearings took place on February 13, 2017, and May 15, 2017. *Id.* at 81. She reported that, at that point, the Parents were participating in protective parenting treatment. *Id.* at 81-82. However, by the May permanency review hearing, Mother was attending individual treatment sessions only. *Id.* at 82-83. Ms. Sell explained that Mother's treatment provider asked her not to return to group treatment sessions "because she was aggressive with other group members[.]" *Id.* at 82. Ms. Sell recalled that Father's non-offending parenting treatment provider discharged him unsuccessfully at approximately the same time. *Id.* at 85.

Ms. Sell testified that another permanency review hearing took place on August 14, 2017. *Id.* at 87. By the time of that hearing, Mother's protective parenting treatment provider had discharged her unsuccessfully as well. *Id.* at 87-88. Nonetheless, CYS arranged for the Parents to attend protective parenting treatment at a new provider. *Id.* at 86, 88. While the Parents were reporting to CYS that they were attending mental health treatment, CYS was unable to obtain documentation confirming their claims. *Id.* at 88-89.

The next permanency review hearing took place on February 5, 2018.[8] *Id.* at 90. Ms. Sell testified that Mother had completed a protective parenting treatment evaluation at a new provider, but that the provider discharged her unsuccessfully in December 2017. *Id.* Mother had been "argumentative and aggressive" toward the treatment provider. *Id.* at 105. The new protective parenting treatment provider also discharged Father unsuccessfully around the same time. *Id.* at 91. Finally, Ms. Sell recounted that the most recent permanency review hearing took place on May 7, 2018. *Id.* at 94. By that time, the Parents had left Lehigh County, following an eviction from their prior residence, and moved to Schuylkill County. *Id.* at 91, 95, 128. Ms. Sell was not aware of the Parents reengaging with protective parenting treatment, nor had the Parents verified their attendance at mental health treatment.[9] *Id.* at 95-96.

Thus, the record confirms that the Parents are incapable of parenting the Sisters, in that they have been either unable or unwilling to comply with the services necessary to regain custody of the Sisters for over thirty months. Most notably, the Parents failed to comply with in-home reunification services

---

[8] In the interim, CYS began a child protective services investigation regarding the Parents' conduct while the Sisters remained in their care. N.T., 8/3/18, at 92. The Parents are now indicated perpetrators of abuse by omission, due to the sexual abuse that occurred in the home. *Id.* at 92-93.

[9] Mother testified that the Parents had been attending treatment, but that they stopped when they moved to Schuylkill County. N.T., 8/3/18, at 254-55, 268-69, 298.

and failed to comply on two occasions with protective parenting treatment. The record further confirms that the Parents cannot or will not remedy their parental capacity within the foreseeable future, due to their refusal to accept responsibility for their circumstances, as well as their refusal to acknowledge that their protective parenting skills are in need of improvement. In addition to Ms. Sell, CYS presented the testimony of Vickie Moyer, Mother's protective parenting treatment counselor. Ms. Moyer authored a letter to CYS, in which she reported that Mother "refused to consider even a small amount of personal accountability for her and her children's present situation." Exhibit P5 at 2. Similarly, Father's protective parenting treatment counselor, Toby Nicolosi, testified that he discharged Father from treatment due to Father's refusal to acknowledge that he had anything to work on.[10] N.T., 8/3/18, at 206-07. In light of this evidence, we discern no abuse of discretion or error of law by the orphans' court in terminating the Parents' rights to the Sisters involuntarily pursuant to Section 2511(a)(2). As this Court has emphasized, "a child's life

_____

[10] CYS also presented the testimony of psychologist, Bradley Beckwith, Ph.D., who conducted a psychological evaluation of Father in May 2016. N.T., 8/3/18, at 147. Doctor Beckwith diagnosed Father with paranoid personality disorder and opined that he was unlikely to be a suitable caretaker for the Sisters. *Id.* at 167. Dr. Beckwith explained that Father "had some of the highest hallmarks for a paranoid personality disorder I've seen. . . . [o]utside of an inpatient setting[,]" including lack of empathy, aggression, an egocentric worldview, a distorted perception of himself, and a distorted perception of others. *Id.* at 174. He estimated that Father would need to attend "anywhere from eighteen months to two years [of] consistent therapy in regular intervals" in order to manage his condition. *Id.* at 191.

cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the orphans' court committed an abuse of its discretion pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

- 14 -

Here, the Parents contend that the orphans' court abused its discretion by concluding that termination would best serve the Sisters' needs and welfare without the benefit of expert testimony. Mother's brief at 22; Father's brief at 18. They further argue that they maintain a bond with the Sisters and that they continued to work toward reunification despite facing adversity. Mother's brief at 22-23; Father's brief at 18-19.[11]

The orphans' court found that involuntary termination of the Parents' rights would best serve the Sisters' needs and welfare pursuant to Section 2511(b), reasoning as follows:

> With respect to the analysis required under 23 Pa. C.S. §[]2511(b), the last time [the Parents] saw [] their daughters was on December 18, 2016. Both parents had the opportunity to write the children in care of the caseworker with the understanding the writings would be reviewed and provided to the children when therapeutically recommended. Neither parent availed themselves of this opportunity to communicate their love to their daughters.

_____

[11] As part of this claim, the Parents also assert that the orphans' court violated Section 2511(b) by terminating their parental rights based on factors beyond their control, such as "housing, mental health issues, and [their] children's 'sexually reactive' behavior amongst themselves." Mother's brief at 22; Father's brief at 18. This contention is meritless, it is apparent from the court's opinion that its sole focus was not on environmental factors such as the Parents' housing. *See* 23 Pa.C.S. § 2511(b) ("The rights of a parent shall not be terminated **solely** on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.") (emphasis added). Rather, the court focused on the Parents' failure and/or refusal to cooperate with services, as well as the Sisters' needs and welfare. We further note that the Parents' "mental health issues, and [their] children's 'sexually reactive' behavior amongst themselves" are not environmental factors within the meaning of Section 2511(b).

Father has seen his children only four times since February of 2016. He has never called [CYS] to ask how his children are doing. He has never contacted the caseworker about anything regarding the children. According to [a letter prepared by Mr. Nicolosi, Father's protective parenting treatment counselor,] the children did better after they stopped having contact with Father.[12]

Mother has not contacted the caseworker about the children for more than a year. Although the caseworker believed that Mother loves [the Sisters], she felt the girls deserve a chance to have a normal upbringing. Even though Mother may love her daughters and feel a bond with them, "a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re T.M.T.*, 64 A.3d 1119, 1128 (Pa. Super. 2013) (internal citations omitted).

Since June of 2016, these sisters have been placed together in a loving kinship foster home where they are well[]cared for and happy. Truancy was no longer an issue after the [S]isters were removed from their parents' care. In the kinship[] home the [S]isters have two parents, they attend school daily, attend dance classes and church, and go on family vacations. The kinship mother successfully completed protective parenting treatment, which was not required of her. The kinship parents intend to adopt the [S]isters if parental rights are terminated. At this point, the bond that is worth preserving is the bond the two sisters have with one another and with their kinship foster parents.

Given that there is no reasonable prospect that [the Parents] will be able to reunite with their children in the reasonably foreseeable future, we find that [the Sisters'] needs and welfare require that we terminate the parental rights of [the Parents] and allow [the Sisters] to achieve stability and permanence with trusted adults who will protect them. 23 Pa. C.S. §[]2511(b).

---

[12] *See* Exhibit P4 at 3 ("On April 13, 2017[,] a team meeting was held to address the family's progress. The treatment team was in agreement in continuing with no visits between the family. The children are responding positively to [having] no contact with their parents/grandparents.")

Trial Court Opinion, 2/15/19, at 19-20 (footnote omitted).

Once again, the record supports the findings and conclusions of the orphans' court. As detailed above, the Sisters entered foster care in January 2016, when A.A.M. was nearly twelve years old, and A.Q.M. was nearly eight. By the time of the termination hearing on August 3, 2018, A.A.M. was nearly fourteen and a half years old, while A.Q.M. was ten and a half years old. The Parents have not visited with the Sisters at all since December 2016 at the recommendation of the Sisters' treatment team, based on concerns that visits were only "continu[ing] to trigger the trauma." N.T., 8/3/18, at 80, 96. Moreover, although the Parents agreed to suspend their visits with the Sisters, Ms. Sell explained that they had the opportunity to send the Sisters letters, cards, or gifts "that would be kept in the file until the [Sister's] therapists deemed it appropriate that they receive them." *Id.* at 98. Ms. Sell confirmed that CYS never received a letter, card, or anything else from the Parents for the Sisters. *Id.*

While it is likely that the Sisters maintain some sort of emotional attachment to the Parents, that attachment has surely weakened due to the length of time that the Sisters have spent in kinship foster care without contact from the Parents. The Parents alone are responsible for the damage that their relationship with the Sisters has suffered, due to their failure to protect the Sisters from the sexual abuse occurring in their own home. Further, contrary to the Parents' assertions, the orphans' court was under no obligation to obtain

expert testimony in order to assess the Sisters' needs and welfare. *See In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010), *reargument denied* (May 28, 2018) (citations omitted) ("When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well."). The court was free to rely on the testimony of Ms. Sell, who opined that termination would best serve the Sisters' needs and welfare, as follows:

> [A.A.M.] is 14 years old now. She should be able to go to a birthday party that has four-wheelers without having to check with the County first. . . . [A.Q.M.] should be able to go to a sleepover without having to call the County and making sure that that's okay. These girls deserve a normal family that loves and nurtures them and not having [CYS] watch over everything they do. They deserve the permanency at this point in time.

N.T., 8/3/18, at 98-99. Ms. Sell further testified that the Sisters are doing very well in their pre-adoptive kinship foster home. *Id.* at 94.

Accordingly, the record confirms that the Sisters' need for permanency, and the opportunity to achieve permanency through adoption by their kinship foster parents, outweighs whatever relationship the Sisters might maintain with the Parents. *See In re T.D.*, 949 A.2d 910, 920–23 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties" existed between the child and his parents, but where preserving the parents' rights would prevent the child from being adopted and attaining permanency). We discern no abuse of discretion or error of law with respect to Section 2511(b).

Based on the foregoing analysis, we conclude that the orphans' court did not commit an abuse of its discretion or an error of law by involuntarily terminating the Parents' rights to the Sisters. We therefore affirm the court's December 14, 2018 decrees.

Decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/24/19